937 P.2d 1182

**STATE of Arizona, Appellee,**

v.

**Richard Lewis JONES, Appellant.**

**Nos. 1 CA–CR 93–0377, 1 CA–CR 93–0388.**

Court of Appeals of Arizona,
Division 1, Department A.

Nov. 19, 1996.

Petition for Review Denied and Cross
Petition for Review Granted
June 5, 1997.

536

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section and Consuelo M. Ohanesian, Assistant Attorney General, Phoenix, for Appellee.

Sandra Burt Freedman, Scottsdale, for Appellant.

WEISBERG, Judge.

Richard Lewis Jones ("defendant") appeals (i) his convictions and sentences for eight counts of sexual assault, a class 2 felony and dangerous crime against children, and (ii) the revocation of his probation following a conviction on one count of endangerment, a class 6 felony. For the following reasons, we affirm six of defendant's convictions, reverse two of his convictions, and affirm his probation revocation with one modification.

# FACTUAL [1] AND PROCEDURAL BACKGROUND

## A. *Cause No. CR 92–08919*

Defendant sexually abused his eldest daughter, CJ, at various times over a ten-year period. CJ was 14 years old when defendant last assaulted her. On October 20, 1992, approximately two weeks after the last assault, CJ, her 13–year–old brother RJ, and her 11–year–old sister SJ reported the abuse to local police.

CJ provided police with details of defendant's assaults, all of which included acts of oral sex as well as penile penetration of CJ's vagina and/or anus. The police investigation led to an indictment charging defendant with eight counts of sexual assault.

In February 1993, shortly after the jury selection process began, CJ, RJ and SJ told the prosecutor that CJ's allegations were false. They said that they had lied to punish defendant for having had an extra-marital relationship, and for the purpose of getting him out of the house.

The case proceeded to trial in March 1993. When CJ, RJ, and SJ failed to appear on the first day of trial, despite a subpoena to do so, they were arrested pursuant to a civil arrest warrant. They were then placed in the Maricopa County juvenile detention center where they remained for approximately one week, until they finished testifying.

CJ testified that her original allegations were true, that defendant had in fact molested her, and that she and her siblings had lied in February to avoid testifying against defendant. RJ's testimony was consistent with CJ's, but SJ testified that the original allegations were false and the February story was true.

A jury convicted defendant on all charges. The court sentenced defendant to aggravated, consecutive 25–year prison terms on all eight counts. Defendant was credited with 223 days of presentence incarceration.

---

1. The facts are viewed in a light most favorable to sustaining the judgment with all reasonable inferences resolved against the defendant. *State v. Atwood*, 171 Ariz. 576, 596, 832 P.2d 593, 613 (1992), *cert. denied*, 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993).

### B. *Cause No. CR 92–02303*

In cause number CR 92–02303, defendant was charged with attempted flight from a law enforcement vehicle in violation of Ariz.Rev. Stat. Ann. ("A.R.S.") section 28–622.01, designated as a class 6 felony pursuant to Ariz. Rev.Stat. Ann. section 13–1001(C)(5). Defendant entered a plea agreement on June 9, 1992, in which he pled guilty to felony endangerment under A.R.S. section 13–1201, a class 6 felony. He received a term of probation. Immediately after sentencing in cause number CR 92–08919, however, the court revoked his probation because of those convictions. The court imposed a 1.5–year sentence on the endangerment charge to be served consecutively to the sentences imposed in CR–92–08919. Defendant was credited with 365 days of presentence incarceration.

Defendant filed a timely notice of appeal in both cases. This court consolidated defendant's appeals by an order dated October 22, 1993. We have jurisdiction to adjudicate the appeal. Ariz. Const. art. VI, § 9; A.R.S. §§ 12–120.21(A)(1), 13–4031, 13–4033(1).

### ISSUES PRESENTED

We address the following issues: [2]

A. Whether defendant's convictions are supported by substantial evidence;

B. Whether the trial court properly admitted evidence of defendant's prior bad acts;

C. Whether the trial court properly denied defendant's motion for a new trial based on the prosecutor's unsupported statement, in closing argument, that defendant's wife "wouldn't put it past her husband to do those things to his daughter";

D. Whether the trial court properly permitted CJ's examining physician to testify that CJ told him defendant had sex with her;

E. Whether the trial court properly admitted the contents of a note written by CJ to her examining physician during the course of her treatment.

F. Whether the trial court properly permitted a police officer to testify as to the dates of the assaults based on information provided by CJ and recorded in a police report;

G. Whether the mandatory and consecutive sentencing provisions set forth at A.R.S. sections 13–604 and 13–604.01 violate the separation of powers doctrine embodied in Article 3 of the Arizona Constitution; and

H. Whether defendant's eight consecutive 25–year sentences offend the Arizona and federal constitutional prohibitions against cruel and unusual punishment.

I. Whether the detention during trial of CJ, RJ, and SJ denied defendant a fair trial.

J. Whether the trial court erred in naming the underlying offense in revoking defendant's probation in cause no. CR 92–02303.

### DISCUSSION

#### A.

◼ We begin with an issue not raised by defendant. Our review of the record reveals that there was insufficient evidence to support two of defendant's eight convictions. Insufficiency of the evidence is fundamental error. *State v. Jannamon,* 169 Ariz. 435, 439–40, 819 P.2d 1021, 1025–26 (App.1991).

The indictment charged defendant with the following counts of sexual assault against CJ: I, oral contact; II, intercourse; III, oral contact; IV, oral contact; V, oral contact; VI, oral contact; VII, intercourse; and VIII, intercourse; totalling five counts of oral contact and three counts of intercourse. The jury found defendant guilty of each count, specifying the nature of the sexual assault on the verdict form.

CJ, however, testified to only seven assaults: three acts of oral contact and four counts of intercourse. There was no evi-

---

**2.** Defendant raised issues B through H on appeal. We have considered *sua sponte* issues A, I and J.

dence of an eighth assault from any source. We therefore conclude that one of defendant's convictions for oral contact must be reversed for insufficient evidence.

■ Additionally, one of defendant's convictions for sexual assault by oral contact was supported only by evidence of sexual intercourse, rather than oral contact. We therefore conclude that another of defendant's convictions for oral contact must be reversed for insufficient evidence.[3]

The oral contact counts in the indictment were alleged to have occurred in the following time periods: Count I, on or about October 1992; Counts III and IV, between March and June 1992; and Counts V and VI, on or about July 1992. Count I is supported by CJ's testimony that an act of fellatio occurred in September or October 1992. Count III is supported by CJ's testimony that an act of fellatio occurred between March and June 1992. Count V is supported by CJ's testimony that a second act of fellatio occurred in September or October 1992.[4] Thus, the counts not supported by the evidence are Counts IV and VI.

### B.

■ Although the eight sexual assaults charged in the indictment took place in 1992, the state moved *in limine* to admit evidence that defendant had committed sexual assaults against CJ from the time she was five years old. The state grounded its motion in Rule 404(b) of the Arizona Rules of Evidence (the "Rules"), asserting that the evidence showed a common plan, scheme or design, opportunity, preparation, identity, corroboration or continuing course of conduct, or was necessary to complete the story. The trial court ruled that the evidence was admissible under Rule 404(b) to "complete the story" and to show absence of mistake or accident, motive or opportunity. The trial court also

determined that the probative value of the evidence outweighed its prejudicial value.

Defendant argues that the prior acts were admitted solely to show his propensity to commit the crimes charged; that such evidence was inadmissible in the absence of foundational medical expert testimony under *State v. Treadaway*, 116 Ariz. 163, 568 P.2d 1061 (1977); that the prejudicial impact of the evidence outweighed its probative value; and that admission of the evidence was reversible error.

We need not, however, reach the issue of whether the prior acts were admissible under the enumerated exceptions set forth in Rule 404(b), because we reject defendant's argument on the basis of *State v. Garner*, 116 Ariz. 443, 447, 569 P.2d 1341, 1345 (1977). In *Garner*, our Supreme Court held that "[i]n a case involving a sex offense committed against a child, evidence of a prior similar sex offense committed against *the same child* is admissible to show the defendant's lewd disposition or unnatural attitude *toward the particular victim*." (Emphasis added.) The state, therefore, did not need to rely on an exception to Rule 404(b) since this particular type of evidence is admissible to show propensity. *Id.; State v. Rojas*, 177 Ariz. 454, 460, 868 P.2d 1037, 1043 (App.1993).

■ Moreover, a *Treadaway* hearing is unnecessary where, as here, the prior bad acts are similar in nature and involve the same victim. "Expert testimony is not needed, and remoteness is not an issue ... when similar molestations occur incessantly over a long period of time against the same victim." *Rojas*, 177 Ariz. at 460, 868 P.2d at 1043. Here, defendant's assaults followed the same pattern over a course of several years, and CJ was his only victim. The case on which defendant relies, *State v. Hopkins*, 177 Ariz. 161, 866 P.2d 143 (App.1993), is inapposite because it involved evidence of defendant's prior sexual molestation of family members *other than* the victim. Accordingly, the trial

---

3. The verdict forms submitted to and signed by the jury specified whether the sexual assault was committed by oral contact or intercourse. On this count, the jury explicitly found that defendant had committed sexual assault by oral sexual contact and there was no evidence to support such a finding.

4. For a discussion of the failure of CJ's testimony to exactly match the dates provided in the indictment, see *infra* section F.

**540**

court did not err by admitting evidence of defendant's prior sexual acts against CJ.

### C.

 Defendant's wife, ChJ, testified for the state as a hostile witness. The prosecutor unsuccessfully attempted to have ChJ acknowledge statements she had made during an October 1992 interview with Detective Eric Stall. At trial, ChJ consistently responded that she did not remember making those statements attributed to her by the prosecutor.

When Detective Stall testified, the prosecutor asked him, "Did you ask [ChJ] whether or not she thought that her husband was capable of doing this, meaning sexually assaulting [CJ]?" Stall responded, "Yes." There is no evidence in the record, however, as to ChJ's actual response to this interview question.

Nonetheless, during closing argument the prosecutor made the following remarks:

And even mom says to Detective Stall, it is not within her daughter's nature to lie. And then she also says something else. She wouldn't put it past her husband to do those things to her daughter.

Defendant objected, arguing that there was no evidence in the record to support the prosecutor's statement. The court stated, "We will let the jury rely on their own recollections of that." The court denied defendant's contemporaneous oral motion for a mistrial and subsequent written motion for a new trial. Defendant argues that the trial court abused its discretion in refusing to grant a mistrial or new trial. We disagree.

 The remark was clearly improper because it was based on facts that were not in evidence. Such a remark requires a new trial if it was probable that the remark affected the verdict, thus denying the defendant a fair trial. *State v. Hansen,* 156 Ariz. 291, 297, 751 P.2d 951, 957 (1988). In reviewing a trial court's decision on this issue, we apply an abuse of discretion standard. *Id.* We conclude that the trial court did not abuse its discretion.

The statement was not as damaging as defendant suggests. It was a purported expression by ChJ of her *opinion* as to defendant's *character,* and a somewhat vague opinion at that. The comment did not imply that ChJ had actually observed defendant committing any untoward act with CJ.

Moreover, we reject defendant's argument that the comment unfairly bolstered CJ's credibility. The jury observed CJ give extensive testimony that provided a great deal of direct evidence against defendant. It is unlikely that the jurors' assessment of her truthfulness was affected by a triple-hearsay reiteration of a comment by ChJ that went indirectly to CJ's credibility.

Furthermore, in response to defendant's objection, the trial court immediately instructed the jurors to rely on their own recollection as to whether Detective Stall had reiterated ChJ's statement to him during his trial testimony. In addition, the court instructed the jury, both before and after the trial, to "decide the facts only from the evidence produced in court," and that statements by the attorneys are not evidence. Under these circumstances, we conclude that the trial court did not abuse its discretion in finding that the improper remark did not affect the verdict.

### D.

 Dr. Parabodh Hemmady examined CJ two weeks after she reported the incident to police. Dr. Hemmady testified as to CJ's statements to him during the examination, pursuant to the Rule 803(4) hearsay exception. Defendant argues that CJ's statements identifying defendant as the perpetrator of the sexual assaults were inadmissible under Rule 803(4) because they were not necessary for CJ's medical diagnosis or treatment.

We need not address the merits of defendant's argument, however, because admission of the evidence, even if improper, was palpably harmless. CJ's testimony was unequivocal in identifying defendant as the perpetrator of the alleged sexual assaults. Thus, Dr. Hemmady's testimony was merely cumulative. In fact, the cumulative nature of this testimony was one of the grounds for defendant's objection:

[It] seems to me there's some sort of rule about evidence regarding cumulative matters and sort of judicial economy. And I think at some point we are going to—the jury just keeps hearing over and over again the same allegations made by [CJ]; what she's already testified to under oath anyway.

The identity of the perpetrator was not at issue here. Defendant took the position that the alleged sex acts never occurred. He did not posit that the acts may have occurred but were perpetrated by some other person. If the jury believed that CJ was sexually assaulted, they clearly would have concluded that defendant was the perpetrator, regardless of Dr. Hemmady's testimony. We therefore conclude that the admission of Dr. Hemmady's testimony regarding CJ's identification of defendant had no impact on the verdict.

We also note that the case on which defendant relies, *State v. Thompson,* 146 Ariz. 552, 707 P.2d 956 (App.1985), is distinguishable. *Thompson* involved a defendant whose child abuse victim had died. The treating physician in that case testified that the deceased victim's sister, while in the hospital waiting room on another occasion, told a third party that the appellant had hit the victim. *Id.* at 558, 707 P.2d at 962. None of the witnesses in *Thompson* saw the appellant inflicting the fatal injury, there was no direct evidence of the crime and, obviously, there was no testimony by the victim. Thus, the *Thompson* facts are quite unlike those in the instant case.

### E.

■ Dr. Hemmady also testified that, during the medical examination, CJ was reluctant to talk about the details of the sexual assaults and that CJ therefore wrote, rather than spoke, her response to the question, "Can you tell us what happened to you?" The prosecutor had Dr. Hemmady read the contents of that writing into evidence.[5] Defendant objected, arguing lack of foundation or authentication. On appeal, he assigns error to the court's denial of the motion on that basis and further argues that the information in the note was inadmissible hearsay because it was not pertinent to the medical examination. We disagree with both arguments.

Rule 803(4) provides a hearsay exception for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." The note provided CJ's physician with information describing the inception and general character of the circumstances that required medical attention. Moreover, Dr. Hemmady indicated that the questions asked of CJ were routine in sex abuse cases. The contents of the note, therefore, were reasonably pertinent to diagnosis or treatment and were admissible under Rule 803(4). *See United States v. Renville,* 779 F.2d 430, 435–39 (8th Cir.1985).

■ Furthermore, Dr. Hemmady's testimony was adequate for purposes of establishing foundation and authentication of the note. He was present when CJ wrote the note, and he read it immediately after she wrote it. He identified the document read in court as a duplicate of the note that CJ wrote. This is typical "testimony of [a] witness with knowledge," as contemplated by Rule 901(b)(1). *State v. Maximo,* 170 Ariz. 94, 97, 821 P.2d 1379, 1382 (App.1991).

■ In any event, even if the court's ruling were erroneous, it was harmless. CJ had already testified in great detail as to the information that was in the note, which was therefore merely cumulative.

### F.

Although CJ testified to the details of the sexual assaults charged in the indictment, her testimony was vague as to dates of the assaults corresponding to Counts III through VIII. She testified to three assaults occurring in September or October, two additional

---

5. The note stated, "My father sexually abused me in many ways. He had intercourse with me many times. Stuck his tongue in my vaginal area. Then after he did those things to me, he stuck his penis in my behind and said do not tell anybody about these happenings."

assaults in September, one assault in May, and one assault sometime between March and June, all in 1992. She testified that it was difficult for her to establish time frames because the assaults occurred on such a regular and frequent basis. When Officer Lynn Parkin interviewed CJ on October 21, 1992, CJ told her that assaults had occurred one week prior to the interview, in July, and between the time of her birthday in March and the beginning of summer vacation in June.

CJ testified before the state called any of the police witnesses to testify. Defendant objected when the prosecutor elicited Officer Parkin's testimony regarding the dates of the crimes as established during the October 21, 1992 interview with CJ. The trial court, however, ruled that the testimony was admissible under Rule 801(d)(1)(B) to rebut a charge of recent fabrication. Defendant now argues that the trial court erred by admitting Officer Parkin's testimony on this issue. As we explain below, we conclude that the trial court did, in fact, err by admitting Officer Parkin's testimony insofar as it provided dates for the assaults, but further conclude that the error was not reversible because defendant suffered no prejudice.

 Rule 801(d)(1)(B) provides that a prior statement of a witness is not hearsay if it is consistent with her trial testimony and is "offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." To be admissible under this rule, the statement must have been made before the purported motive to fabricate arose. *See, e.g., State v. Martin*, 135 Ariz. 552, 553–54, 663 P.2d 236, 237–38 (1983). If the statement meets these requirements, it is admitted substantively, and not just to buttress the witness' credibility. *Id.* at 553, 663 P.2d at 237.

 We first note that the trial court properly admitted, pursuant to Rule 801(d)(1)(B), Officer Parkin's testimony about CJ's statements reporting that defendant had sexually assaulted her and describing the assaults. At trial, defendant expressly adopted the position that CJ's February recantation was truthful, and that her trial testimony was false. In cross-examining CJ

earlier in the day, defendant attempted to develop the theory that CJ was fabricating her trial testimony in order to get out of a juvenile detention facility:

Q: Okay. Last Friday [at trial], before you told that on Friday, did you tell her or anyone else who works with her that the story you told in February was not true?

A: No.

Q: So it was only after you'd been in jail for two days that you told someone that the February story was not true?

A: Yes.

In addition, defendant forcefully argued the recent fabrication theory during closing argument:

These kids are old enough to figure out after they have been sitting in jail for five days, and this is the last story they told, and now they are in jail, and they are in jail because of this trial, what story should they tell to get out of jail? You don't have to be a rocket scientist to figure it out.

There's only two stories. This one kept them out of custody. This one got them picked up and held in the police station for three hours. This one got them put in jail a few weeks later. Which one are we going to tell now? Gee, maybe if we tell he did it story we will get out of jail. Do you know what, they got out of jail.

CJ's October statements to Officer Parkin, that defendant had assaulted her and describing the nature of the assaults, were clearly consistent with her trial testimony. These statements, moreover, were made prior to CJ's being placed in juvenile detention, which defendant asserted was the motive for her to fabricate her trial testimony. Accordingly, these statements were properly admitted under Rule 801(d)(1)(B) to rebut defendant's charge of CJ's recent fabrication. *Compare State v. Tucker*, 165 Ariz. 340, 343, 798 P.2d 1349, 1352 (App.1990) (evidence of child's recantation of accusations against defendant did not justify introduction of the child's prior consistent statements to a police officer: "The defense removed this basis for admissibility by foregoing use of the recantation.").

■ This theory, however, does not support the introduction of CJ's statements to Officer Parkin concerning the approximate dates of the assaults. CJ's statements to Officer Parkin concerning the dates was inconsistent with her trial testimony regarding the dates. The prosecutor even acknowledged this in her argument for the introduction of these statements at trial: "[W]hat we are looking [for] ... is to know whether or not the officer remembers the time frames. [CJ], to the best of my recollection, did not give a specific time but she did give the officers the times."

If CJ had provided the specific dates in her trial testimony and the defense then charged that she had recently fabricated those dates, evidence of CJ's October statements regarding the dates would have been admissible. That, however, was not the case here. Thus, because CJ's statements to Officer Parkin concerning the dates of the assaults were not consistent with CJ's trial testimony, Officer Parkin's testimony regarding these particular statements was not admissible under Rule 801(d)(1)(B).

The state alternatively urges us to affirm the trial court's ruling for the reason that CJ's inability to remember the dates of these incidents makes her an "unavailable" witness under Rule 804(a)(3). But, even if the declarant is "unavailable," the testimony must fall within one of the hearsay exceptions listed in Rule 804(b). The state has not argued which specific exception applies to Officer Parkin's testimony, and we conclude that none of them do.

■ Nor does Rule 804(b)(5), the "catch-all" provision, apply because CJ's statements to Officer Parkin do not possess the "circumstantial guarantees of trustworthiness" required by this exception. *Cf. State v. Robinson,* 153 Ariz. 191, 201–02, 735 P.2d 801, 811–12 (1987) (hearsay statements supported by "equivalent circumstantial guarantees of trustworthiness" when the statements made by a five-year-old were spontaneous, consistent, and corroborated by both physical evidence and behavorial changes). Accordingly, we conclude that Rule 804(b)(1)(5) does not apply and that Officer Parkin's testimony concerning the approximate dates of the alleged assaults was therefore improperly admitted.

■ Defendant, however, has not argued why this error should result in the reversal of his convictions. He apparently assumes that the lack of a specific time frame results in insufficient evidence to support the charges in the indictment. We disagree.

We conclude that the introduction of Officer Parkin's testimony regarding the dates of the assaults was harmless. The date of the offense is not an element of sexual assault. *See* A.R.S. § 13–1406(A). The dates provided by Officer Parkin, therefore, were not material to proof of the state's case. *See State v. Verdugo,* 109 Ariz. 391, 392, 510 P.2d 37, 38 (1973). Furthermore, it cannot be argued that the testimony bolstered CJ's credibility for the simple reason that Officer Parkin's testimony regarding dates was not consistent with CJ's; this is precisely why Officer Parkin's testimony was inadmissible to rebut defendant's charge of recent fabrication under Rule 801(d)(1)(B). We therefore conclude beyond a reasonable doubt that Officer Parkin's testimony regarding the dates of the offenses did not affect the jury's verdict.

■ We further conclude that CJ's testimony regarding the dates of the assaults was sufficient to support the convictions. As noted above, CJ's testimony generally established seven sexual assaults occurring between late March and September or October 1992. The indictment alleged two offenses occurring "on or about October, 1992;" two offenses occurring "on or between" March 27 and June 15, 1992; and four offenses occurring "on or about July, 1992." We conclude that the differences between the dates alleged in the indictment and the more general dates provided by CJ do not require reversal of defendant's convictions because defendant has shown no prejudice.

First, though CJ's dates corresponding to most of the specific counts do not exactly match those of the indictment, both CJ's testimony and the indictment generally establish assaults occurring between late March and October 1992.

 A technical or formal defect in an indictment may be remedied by amendment. A defect is technical or formal if it does not change the nature of the offense charged or prejudice the defendant in any way. *State v. Bruce,* 125 Ariz. 421, 423, 610 P.2d 55, 57 (1980). An error as to the date of the offense alleged in the indictment does not change the nature of the offense, and therefore may be remedied by amendment. *Id.; State v. Self,* 135 Ariz. 374, 380, 661 P.2d 224, 230 (App.1983). When the amendment results in no change in the underlying offense or actual prejudice to the defendant, the indictment is automatically deemed amended to conform to the evidence adduced at trial. *State v. Roscoe,* 145 Ariz. 212, 225, 700 P.2d 1312, 1325 (1984), *cert. denied,* 471 U.S. 1094, 105 S.Ct. 2169, 85 L.Ed.2d 525 (1985); *State v. Winter,* 146 Ariz. 461, 465, 706 P.2d 1228, 1232 (App.1985); Ariz. R.Crim. P. 13.5(b).

 Accordingly, absent prejudice to defendant, the indictment in the instant case is deemed amended to conform to the evidence, which established that the sexual assaults occurred between late March and October 1992. Defendant has the burden of showing that he suffered *actual* prejudice. *State v. Hamilton,* 177 Ariz. 403, 410, 868 P.2d 986, 993 (App.1993); *see also United States v. Austin,* 448 F.2d 399, 401 (9th Cir.1971) ("Generally, exact dates are not required so long as they are within the statute of limitation and no prejudice is shown. Appellant has made no showing as to how he was prejudiced.") (citation omitted). Defendant, however, has not even *alleged* any *theoretical* prejudice, let alone demonstrated *actual* prejudice.

In *Hamilton,* for example, the indictment alleged that the defendant had molested the victim sometime between October 1, 1986 and May 31, 1987. This court held that, "[a]lthough the indictment does allege time periods in which the offenses were alleged to have occurred ranging up to one year, defendant does not show any *actual* prejudice therefrom." *Id.* We reasoned that

> [d]efendant's assertion that he was unable to present an alibi defense, because he could not reconstruct his life for a specific year, is a theoretical, not an actual, preju-dice that could be asserted any time an offense was alleged to have occurred over a period of time.

*Id.* at 410 n. 6, 868 P.2d at 993 n. 6. In the instant case, defendant has not even asserted a theoretical inability to present an alibi defense. Nor has he asserted that the broad range of dates established by CJ's testimony, and hence the amended indictment, prejudiced him in any other way.

Defendant did not use an alibi defense at trial, nor did he argue that the crimes were committed by another person. Rather, his sole defense was that CJ was lying. As in *State v. Schroeder,* 167 Ariz. 47, 53, 804 P.2d 776, 782 (App.1990),

> Defendant's only defense was that the acts did not occur. Thus, the jury was left with only one issue—who was the more credible of the only two witnesses to the alleged acts? [T]he jury's verdict here implies that it did not believe the only defense offered.

Any defect in the dates alleged in the indictment, therefore, could not have prejudiced his defense. *See id.; State v. Herrera,* 176 Ariz. 9, 15, 859 P.2d 119, 125, *cert. denied,* 510 U.S. 966, 114 S.Ct. 446, 126 L.Ed.2d 379 (1993) (even if error occurred because the state alleged alternate mental states, such error was harmless because defendant's sole defense was that he did not participate in the offense). Accordingly, we conclude that CJ's testimony regarding the dates of the assaults was sufficient to support defendant's convictions.

### G.

 Sexual assault against a minor under 15 years of age is punishable as a dangerous crime against children. A.R.S. § 13–1406(B). A.R.S. section 13–604.01 requires "flat time" consecutive sentencing for such crimes. Section 13–604(*L*) provides that a trial court's failure to impose sentences in accordance with the mandates of Title 13, the Arizona Criminal Code, amounts to malfeasance. Defendant contends that this sentencing scheme offends Article 3 of the Arizona Constitution, which provides that "no one of such [branch]es of state government] shall exercise the

power properly belonging to either of the others." Defendant argues that the malfeasance provision "infringes on the judiciary's constitutional role by requiring the trial court to impose an excessive sentence, based on the prosecutor's discretion of whether to charge a crime as dangerous against children, and infringes on the judiciary's common law and statutory role of reducing excessive sentences." We disagree.

This court rejected a virtually identical argument in *State v. Garcia,* 176 Ariz. 231, 235, 860 P.2d 498, 502 (App.1993), and held that A.R.S. section 13–604(*L*)

> does not affect the allocation of power between the prosecutor and the trial judge. Rather, the statute reflects an exercise of legislative control over criminal penalties. *See [State v.] Prentiss,* 163 Ariz. [81] at 84, 786 P.2d [932] at 935 [(1989)] ("The legislature sets the sentencing limits and distributes the authority to control the sentence, within those limits, in the courts, correctional authority, and the parole board.").

Defendant's argument differs from the appellant's argument in *Garcia* only in that *Garcia* involved the mandatory imposition of a prison term under A.R.S. section 13–604(G) rather than mandatory consecutive sentences. That distinction, however, does not go to the substance of our reasoning in *Garcia.* Accordingly, *Garcia* is controlling and we reject defendant's argument.

### H.

■ The Eighth Amendment to the United States Constitution and Article 2, Section 15 of the Arizona Constitution both proscribe cruel and unusual punishment. Sentences which are "grossly disproportionate" to the crime committed are considered cruel and unusual, and offend these constitutional provisions. *State v. Bartlett,* 171 Ariz. 302, 310, 830 P.2d 823, 831 (1992) *cert. denied,* 506 U.S. 992, 113 S.Ct. 511, 121 L.Ed.2d 445 (1992) (*"Bartlett II "*). Although defendant argues that the trial court's imposition of eight consecutive 25–year sentences was a grossly disproportionate punishment, because we reverse two of defendant's convictions, we limit our review to whether a sentence of six consecutive 25–

year prison terms is grossly disproportionate to the crimes committed. We conclude that it is not.

■ *Bartlett II* requires a threshold inquiry to determine whether a comparison of the crime with the sentence supports an inference of gross disproportionality. 171 Ariz. at 305, 830 P.2d at 826. In conducting this inquiry, we consider such factors as the harm caused or threatened to the victim or society, the level of defendant's culpability, as measured by the seriousness of the crime and against whom it was committed, the level of violence employed, and other aggravating and mitigating factors. *Id.* Defendant's challenge to his sentence does not survive this threshold inquiry.

The harm to the victim was substantial. CJ suffered humiliation, fear, and threats of retribution when defendant forced her to submit to these many sexual assaults. Defendant was not dissuaded from his actions by CJ's screaming, fighting, or protestations that the acts of anal intercourse were especially painful. To CJ's tearful pleas he responded, "It will be over in a minute." Defendant neglected to use any type of contraceptive or prophylactic, thus subjecting CJ to the risks of pregnancy and sexually transmitted diseases. The seriousness of the harm done to CJ was manifest.

Moreover, the victim was defendant's own daughter, who suffered her father's sexual assaults from the time she was a young child. As in *State v. Zimmer,* 178 Ariz. 407, 410, 874 P.2d 964, 967 (App.1993), we are dealing with "predatory conduct by a mature adult in a position of trust and authority with a young and unwilling victim." Breach of his daughter's trust is especially offensive. We note that this type of "coercive, psychologically brutalizing relationship between an adult man in a position of trust and authority over" a child, was also deemed harmful to society in *State v. Hamilton,* 177 Ariz. 403, 408, 868 P.2d 986, 991 (App.1993).

In addition, defendant threatened violence to CJ, CJ's mother, and CJ's brothers and sisters if CJ or RJ reported the assaults to anyone. After they had reported the abuse,

defendant repeated the same threats if they testified to what they knew.

Defendant's culpability is clear. He violated his daughter repeatedly and methodically over a long period of time. Furthermore, he has expressed no remorse and accepted no responsibility for his actions.

Under these circumstances, the six consecutive 25-year sentences are proportionate to the crime. This conclusion is supported by a review of other Arizona cases involving dangerous crimes against children in which lengthy sentences survived Eighth Amendment challenges. *See, e.g., State v. Jonas,* 164 Ariz. 242, 792 P.2d 705 (1990) (25 years flat time where defendant sold two marijuana cigarettes to 14-year-old boy); *State v. Taylor,* 160 Ariz. 415, 773 P.2d 974 (1989) (2,975 years flat time where defendant convicted of 85 counts of sexual exploitation of a minor, sexual conduct with a minor under 15, and attempted sexual conduct with a minor under 15); *Zimmer,* 178 Ariz. at 410, 874 P.2d at 967 (51 years flat time where defendant touched 11-year-old victim's breast three times, and touched her vagina over her underpants three times); *Hamilton,* 177 Ariz. at 408, 868 P.2d at 991 (135 years flat time for three acts of molestation and three acts of sexual conduct by live-in boyfriend against his girlfriend's 14-year-old daughter); *State v. Smith,* 156 Ariz. 518, 753 P.2d 1174 (App. 1987) (91 years flat time where defendant convicted on two counts of sexual conduct with a minor, two counts of child molestation, and one count of sexual exploitation of a minor); *State v. Crego,* 154 Ariz. 278, 742 P.2d 289 (App.1987) (40 years flat time where defendant convicted of two counts of child molestation).

Accordingly, because the sentences imposed do not support an inference of gross disproportionality, we conclude that they are constitutional.

## I.

■■■ As previously noted, when CJ, RJ, and SJ failed to appear on the first day of trial, despite a subpoena to do so, they were arrested pursuant to a civil arrest warrant. They were then placed in the Maricopa County juvenile detention center where they remained for approximately one week, until they finished testifying. Defendant did not object to these events at trial and has not argued them as a ground for reversal in his appeal. Notwithstanding, the dissent argues that this conduct constituted unlawful coercion of the children's testimony and thereby denied defendant a fair trial.

While we regret the procedurally incorrect detention of the children, we do not believe that it denied defendant a fair trial. Even though the trial court failed to comply with the procedural requirements for securing the testimony of material witnesses, *see* A.R.S. §§ 13-4081 to 13-4084; Ariz. R. Civ. P. 64.1., and even though such failure resulted in violations of the children's due process rights, the rights we are concerned with here are those of defendant, not the children.

The issue is thus whether the violation of the children's due process rights constituted coercion that affected their testimony, thereby depriving defendant of a fair trial. Because defendant has not objected to this conduct, we consider only whether it resulted in fundamental error. *State v. Gendron,* 168 Ariz. 153, 154, 812 P.2d 626, 627 (1991); *see also* A.R.S. § 13-4035. We conclude that it did not.

To begin, we note that, if the state had complied with the appropriate procedural requirements, it had the authority to compel the children's testimony and to detain them up to three days until they testified either in court or by conditional examination for later introduction at trial. *See* A.R.S. § 13-4083(B). Had these procedures been followed, there would be no reason to argue that the lawful detentions somehow violated defendant's due process rights.

In any event, there is no evidence that the violations of the children's due process rights caused them to alter their trial testimony. In the absence of such evidence, it would be pure speculation for us to conclude that these procedural abuses caused two of the three children to reject their prior recantations. Furthermore, the effect on the children's testimony was thoroughly explored in defense counsel's cross-examination of the children, and was argued to the jury in closing argu-

ments. We therefore conclude that the violations of the children's due process rights did not deprive defendant of a fair trial.

### J.

Defendant has not raised any issues specific to the probation revocation in cause no. CR 92–02303. We therefore affirm the trial court's revocation of probation and the sentence imposed.

Notwithstanding, in sentencing defendant, the trial court mistakenly treated the underlying offense as attempted unlawful flight from a law enforcement vehicle (the offense with which defendant was charged), rather than felony endangerment (the offense to which he pled guilty). Both offenses, however, are class 6 felonies subject to identical sentencing ranges. Furthermore, defendant received the presumptive prison term and there do not appear to be any mitigating factors applicable to revocation of one charge but not the other. We therefore merely amend the June 2, 1993 minute entry to reflect that defendant has been adjudged guilty of endangerment, rather than attempted unlawful flight.

### CONCLUSION

We have searched the record for fundamental error, pursuant to A.R.S. section 13–4035, and, aside from the errors noted above, have found none. Accordingly, we affirm six of defendant's convictions and sentences, and reverse two of defendant's convictions and sentences. Defendant's probation revocation and sentence in CR 92–02303 are affirmed, subject to the modification embodied in the following order.

IT IS ORDERED, *nunc pro tunc,* amending the trial court's minute entry order dated June 2, 1993 in CR 92–02303, as follows:

1. Page 43, paragraph three, shall read, "OFFENSE: Amended Count III: Endangerment," and

2. Page 43, paragraph five, shall read, "IN VIOLATION OF A.R.S. SECTIONS: 13–1201, –701, –702, –801, –802, –812."

GARBARINO, J., concurs.

FIDEL, Presiding Judge, dissenting in part.

I concur in the reversal of conviction on Counts IV and VI. But I would reverse conviction on all counts. This trial, in my judgment, was fatally undermined by the unlawful and inherently coercive detention of the children who testified against defendant.

The primary evidence against defendant is the testimony of CJ, defendant's 15–year–old daughter, and RJ, his 13–year–old son. These children recanted, then reinstated, accusations that their father had molested CJ. Recanted and reinstated charges are not unusual in child abuse cases, and courts must find the truth as best they can. But this case is uniquely troubling.

It is useful at the start to consider several features that make this at best a weak case against defendant: First, CJ and RJ, when recanting their initial accusations, said they had reported their father to the police because they were angry that he had brought a woman into the house for extra-marital sexual relations. Second, SJ, an 11–year–old sister who joined her siblings in both their October accusations and their February recantation, has stood by her recantation, testifying that the accusations were a false concoction to punish their father and get him out of the house. Third, there is no corroborating physical evidence. CJ reported that she had been repeatedly subjected to vaginal intercourse over a period of nine years and to several especially painful episodes of anal intercourse, one of them six months before trial and only four weeks before a medical examination for sexual abuse. Yet, upon examination, CJ's hymen was intact, and she had no signs of anal scarring or abrasion.

None of these points rules out the validity of the charges. But they highlight how closely the State's case depends on the accuracy and credibility of CJ and RJ. (For these reasons among others, the court finds insufficient circumstantial guarantees of trustworthiness to support application of Rule 804(b)(5) of the Arizona Rules of Evidence, the hearsay "catch-all" provision, to CJ's statements to Officer Parkin.) This is not a case in which the evidence weighs so heavily

toward conviction as to overwhelm substantial error.

Against this backdrop, I come to the issue of the unlawful coercive force that the State and trial court brought to bear to obtain the testimony of the children.

In February 1993, at an evening meeting at the office of the county attorney, CJ, SJ, and their mother informed the county attorney that the children had made up the accusations against defendant. While their mother was interviewed in a separate room, CJ and SJ departed unannounced for their grandmother's home. Subsequently, on February 26, Peoria police officers came to their school, had CJ and SJ removed from school, and brought them to the police station. CJ asked to call her mother before leaving the school and repeated her request at the station. The officers denied both requests. CJ asked whether her mother knew they were being questioned and was told that she did . not. At the station, the girls were locked in a room and taken separately for recorded interviews. (The record does not show the circumstances under which the State interviewed RJ.)

At the county attorney's request, subpoenas for the mother, CJ, RJ, and SJ were served upon the mother, directing all four to appear on Tuesday, March 23, at 10:00 a.m., the first day of trial. The witnesses did not appear. On Wednesday, March 24, at the county attorney's request, the trial court issued civil arrest warrants for each of them. That afternoon, Peoria police officers arrested the mother and three children at their home, handcuffed each of them, and brought them to the police station. From the station, the mother was transferred to the county jail and the children to juvenile detention. No . hearing was provided. On Thursday, March 25, the trial court signed a transportation order, directing that the three children be brought from the juvenile detention center to the trial court at 1:00 p.m. on Monday, March 29. By that order, the court extended the hearingless confinement of the children through the weekend.

After five nights in juvenile detention, RJ was brought to court to testify on March 29. Because RJ did not finish his testimony on the 29th, he was sent for another night in juvenile detention and brought back to court on the following day. CJ and SJ spent six nights in juvenile detention before they were brought to court to testify on the 30th. SJ completed her testimony on that day; but like RJ, CJ did not finish her testimony on the first day and was returned to juvenile detention for another night and then brought back to court the following day.

The trial court made no finding that the children needed to be placed in detention for their own protection (their father awaited trial in jail). Nor did the trial court find the children—or their mother—in civil or criminal contempt. Without a hearing, the trial court had no way of knowing whether the children even knew their mother had been served with a subpoena, or whether the children knew they were subject to a subpoena, much less whether the children had chosen to defy the court order.

Rule 64.1(b) of the Arizona Rules of Civil Procedure permits a court to issue a civil arrest warrant "in a non-criminal matter" when a person fails to appear in court in person as directed in a subpoena. Having issued bench warrants in a criminal matter pursuant to a rule intended for non-criminal matters, the trial court compounded its error by ignoring the protective requirements of the rule. Rule 64.1(d) requires the arrested person to "be brought immediately before the issuing judge if it is reasonably possible" and before some judge "within 24 hours of the execution of the warrant." The children were not brought before a judge for at least five days. Rule 64.1(e) further requires the judge to "*release* the arrested person on the least onerous terms and conditions which reasonably guarantee the required appearance." (Emphasis added.) The record suggests that release options were available. (The children's maternal grandmother demonstrated her reliability by coming to court on the first day of the trial as required by subpoena, the great-grandparents of the children lived in town, and RJ, by the time of trial, had been living with his great-grandparents for at least two weeks.) Yet the trial court, without considering release alternatives, subjected the children to the most on-

erous terms and conditions, leaving them confined to await trial and complete their testimony for six and, in CJ's case, seven days.

The trial court never considered, much less followed, the statutory procedures for securing the presence of a material witness in a criminal case. *See* Ariz.Rev.Stat. Ann. ("A.R.S.") §§ 13–4081 to 13–4084 (1989). Nor did the county attorney bring these statutes to the court's attention. Pursuant to these statutes, after a preliminary hearing, a material witness may be required to post an appearance bond and, if unable to do so, may be confined—under "extreme circumstances"—for no more than three days. *State v. Reid,* 114 Ariz. 16, 25, 559 P.2d 136, 145 (1976) ("Confinement of a witness, even for a few days, not charged with a crime, is a harsh and oppressive measure ... justified only in the most extreme circumstances."). Here, with no hearing, no showing of extreme circumstances to justify any days of confinement, much less the three-day statutory maximum, and no consideration of available release alternatives, the court confined the children for nearly a week. Statutory requirements, like the requirements of Rule 64.1, were wholly ignored.

This chain of events unquestionably denied due process to the children (and to their mother, who similarly was confined in neglect of the statutes and rule). The material questions are whether this chain of events also denied due process to defendant, and, if so, whether it amounted to fundamental error.

My answer to these questions is yes. The last word from the children before they were detained was that they had falsely accused their father. But after grossly impermissible detention that must have seemed interminable to a child, two of the three asserted that their original accusations had been true. Where the truth lies is hard to know. This was not an easy problem for the trial court or the State. The State was responsible for protecting the child witnesses from inappropriate family pressure to recant, and the State undoubtedly suspected such pressure in this case. But the State was not entitled, in pursuit of its position, to sweep away protective rules and procedures and employ detention as a countervailing pressure to accuse.

"[T]here is no table of weights and measures for ascertaining what constitutes due process." *Burns v. Wilson,* 346 U.S. 137, 149, 73 S.Ct. 1045, 1052, 97 L.Ed. 1508 (1953) (separate opinion of Frankfurter, J.). Here, however, the State and trial court vastly exceeded acceptable bounds, and secured the critical evidence against defendant by such improperly coercive means as to reach the foundation of the case and deprive defendant of a fair trial. *See State v. King,* 158 Ariz. 419, 424, 763 P.2d 239, 244 (1988).

I have focused primarily on the confinement of the children, but two points further weigh in my dissent. First, I cannot minimize, as the majority does, the State's attribution to defendant's wife of the opinion that defendant was capable of molesting his daughter. Molestation of one's own child is so abhorrent an act that a jury would likely suppose it beyond the capacity of most human beings. Such a jury, however, might more readily be persuaded to attribute such an act to a person if told that his wife found it consistent with his character.

Second, I cannot say, as the majority does, that defendant's convictions were unaffected by inadmissible hearsay from Officer Parkin. The majority acknowledges that CJ's testimony was vague; the majority acknowledges that CJ's report to Officer Parkin lacked circumstantial guarantees of trustworthiness; and the record contains no physical evidence to corroborate CJ's on again, off again accusations. Through inadmissible testimony from Officer Parkin, the State supplied dates and time frames that it could not supply through the testimony of CJ. The majority reasons that the State was not required to supply these dates and times. The majority ignores that, by doing so through Officer Parkin, the State supplied a bolster or undergirder for CJ's testimony that may have influenced the jury's decision to convict. To say that error was harmless, we must be "confident beyond a reasonable doubt that the error had no influence on the jury's judgment." *State v. Bible,* 175 Ariz. 549, 588, 858 P.2d 1152, 1191 (1993). I cannot say that here.

For the foregoing reasons, I would reverse this conviction in its entirety. Further, I would hold the children's trial testimony and statements in detention inadmissible upon retrial and place the burden on the State to show that any subsequent statements by the children are sufficiently attenuated from the coercive confinement to be reliable upon retrial.